**RESPECT INCORPORATED and Coleen Mast, Plaintiffs,**

v.

**COMMITTEE ON the STATUS OF WOMEN, d/b/a PROJECT RESPECT, Defendant.**

No. 90 C 3770.

United States District Court, N.D. Illinois, E.D.

Feb. 17, 1993.

Amended May 28, 1993.

**1114**

Daniel F. O'Connell, Joliet, IL, for plaintiffs.

Timothy E. Levstik, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

In part this case poses the frequently litigated question of who owns the copyright when an organization engages someone to create or to rework materials in a copyrightable way that suits the organization's needs, but does not define—in writing—whether the compensated creator is an employee or an independent contractor.[1] At stake are competing policies—policies that on the one hand support those whose work (and often creativity) brings a vision to life, as against on the other hand supporting the organizations without whose funds and supervision (and perhaps creativity) the final product might never have come to fruition. As is often the case when such an issue arises, the concept of joint authorship may also be in play.

What sets this case apart from most other copyright cases that involve work-made-for-hire and joint-authorship questions is the interaction of a federal agency regulation that seeks to give the government rights when its funds are used to develop a copyrightable work. As it turns out, this opinion must decide whether (absent a written agreement) an organization that has received government funds and permission to reprint a work—even though neither it nor the government owns the copyright—may compete with the copyright owner by printing and distributing copies of the work that would otherwise have to be purchased from the owner.

This action began when Coleen Mast ("Mast") and Respect Incorporated ("Respect," treated as a singular collective noun) lodged an eight-count Complaint against Committee on the Status of Women ("Committee") that sought relief for a number of alleged violations of Respect's rights. This Court's January 2, 1992 memorandum opinion and order (the "Opinion," 781 F.Supp. 1358 [2]) has granted summary judgment dismissing Counts III and VI, leaving open the Complaint's claims asserting copyright infringement (Count I), service mark/trademark infringement (Count II), common law unfair competition (Count IV), Lanham Act violations (Count V) and fraud in the inducement of a contract (Count VII), as well as a request for an accounting (Count VIII).

Each party now moves under Fed.R.Civ.P. ("Rule") 56 for a partial summary judgment in its favor limited to Count I's copyright claim. More accurately, what has been placed at issue currently is liability on that claim—neither side has sought to quantify the damages if Respect prevails. For the reasons stated in this memorandum opinion and order, Respect's motion is granted and Committee's is denied.

### Facts [3]

As in their filings that led to the Opinion, the parties' submissions are factually far

---

1. Though that issue now frequently arises where a large corporation engages independent computer programmers to create software (see, e.g., Charles Ossola, *"Joint Work" Theory Raises New Questions on Authors' Rights*, Nat'l L.J., Jan. 18, 1993, at S10), the problem has been around for years (see, e.g., such cases as *Scherr v. Universal Match Corp.*, 417 F.2d 497 (2d Cir.1969)).

2. Citation of the Opinion will take the form "Opinion at—," setting out the F.Supp. page number but omitting any repetition of the volume number.

3. Familiar rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to the nonmovant (*Bank Leumi*

broader than proves necessary to hit the current motions' target.[4] This section will therefore set out only those facts that are both necessary to give the uninitiated a quick overview of the case and germane to the copyright issues now at hand. Some pertinent facts not contained in this section are found later in the text.

Both Respect and Committee are proponents of sexual abstinence education as an element of school curricula. To that end each has been involved in development of a program called "Sex Respect" (sometimes referred to here simply as "the program") for use in schools—a program that included three books entitled *Sex Respect: The Option of True Sexual Freedom:* a teacher's manual, a parent's manual and a student workbook (collectively "the books").

But despite their shared convictions on the promulgation of sexual abstinence education, discord has frequently marked the relationships among those involved in this case—not only the current litigants but others with whom they have dealt. What follows is a recital of the development and disintegration of alliances between the early beginnings of the abstinence education concept and the administration of the later-obtained federal grant.

Sex Respect was initially developed as a program by Mast, who taught it for years before she entered into negotiations with Committee. By 1985 Committee (through its President Kathleen Sullivan ("Sullivan")) had become involved and advised Mast that federal funds might be secured to develop use of the program in public schools. Mast, desiring to work further on the program and to disseminate it more widely, met—through Sullivan—Douglas Hofmeister ("Hofmeister"), head of publishing company United Communications of America, Inc. ("UCA"), to explore commercial reproduction of the teaching materials.

On July 8, 1985 Committee submitted a grant application to the Office of Adolescent Pregnancy Programs of the United States Department of Health and Human Services ("HHS"). Because the then administration policy was consistent (if not indeed a hand-in-glove fit) with abstinence education, on September 30, 1985 HHS (through Jo Ann Gasper ("Gasper"), the HHS official administering the funds) awarded Committee a three year grant of over $275,000 in federal funds to carry out a pilot expansion of the program in selected public schools. HHS conditioned the grant in part on the submission, for suggestions and pre-approval, of drafts and final versions of all printed materials developed with grant funds.

Meanwhile, on July 29, 1985 Mast and UCA had entered into a publishing contract under which UCA agreed to publish the workbook, a teacher handbook and a parent handbook. Mast assigned to UCA the exclusive right to publish the three works as well as the copyrights themselves. Mast began to write the books in August 1985.

On October 15, 1985 Mast and Committee entered into an oral personal services agreement (an agreement that Opinion at 1362–65 has held unenforceable under Illinois law). Then after Mast had delivered her manuscripts to UCA, it began to produce the books, some of which Committee ordered.

Mast and UCA later had a falling-out that resulted in litigation separate from this case. That litigation (and the settlement that ensued) provided Mast with renewed control over the manuscripts and Respect with the assigned copyrights to the books. Hence beginning in January 1986 Committee ordered books directly from Respect.

But Committee was not content to look to Respect as its sole source of the books. On

---

*Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991) (citations omitted)). Where as here cross-motions are involved, that principle thus demands a dual perspective—one that this court often has described as Janus-like—that sometimes involves the denial of both motions.

**4.** Committee, for example, argues at its Mem. 7 that "[p]laintiffs should not now be permitted to interfere with [Committee's] authorized efforts to encourage teenagers to engage in healthy sexual practices." That self-congratulatory tone is really irrelevant to adjudication of the current dispute—Respect also claims to occupy the higher moral ground here, but it matters not at all which litigant is right (or even if both are wrong) on that score.

February 11, 1987 it requested permission from HHS to print and distribute the books itself. Having received a March 17, 1987 letter from HHS (through Gasper) that purportedly granted it unrestricted permission to reprint and to disseminate the books, Committee began to do so. Meanwhile it had continued to order additional books from Respect until some time in the spring of 1987, when a dispute arose over price. Committee's own independent activity, by its own account, has encompassed the printing and distribution of over 160,000 books.

Each party now claims entitlement to a judgment as a matter of law on Count I's copyright issues. Analysis of their respective rights requires an initial determination of copyright ownership, to be followed by a decision on whether—if it does not own the copyrights—Committee has been legitimately authorized to reproduce and distribute the books without making any payment to Respect.

### Copyright Ownership

There is no doubt that the books are copyright-protectable, though Respect needlessly devotes significant space to that subject in its memorandum. To resolve the question of who owns the copyrights, this opinion must explore the two already-mentioned subjects of work made for hire and joint authorship.[5]

### 1. Work Made For Hire

■ Respect and Committee—having failed to define their relationship in writing—disagree vehemently on whether (assuming for present purposes that Mast received compensation from Committee for writing the books [6]) Mast was an employee or an independent contractor. Committee goes so far as to say that "Mast's assertion that she is entitled to judgment that she was not a . . . work for hire is not only baseless, but is close to the Rule 11 precipice." As support for its position, Committee emphasizes that Mast received a salary and that Committee withheld taxes.

But on the facts of this case, that in terrorem argument and its invocation of Rule 11 are dead wrong. Instead that bootless threat exemplifies the old saw that those who live in glass houses should not throw stones. On all the evidence, this Court has concluded that no reasonable factfinder could accept Committee's argument that Mast was an employee in the context of 17 U.S.C. § 101(1),[7] the definitional "work made for hire" provision of the Copyright Act of 1976 ("Act").

■ Copyright ownership "vests initially in the author or authors of the work" (Act § 201(a)), and the owner has the exclusive right to reproduce, distribute or display the copyright-protected work (Act § 106). But under the Act's "work made for hire" concept, an organization accused of copyright infringement not only has a valid defense but actually owns the copyright if it proves that the allegedly infringed-on materials were

---

5. As an alternative argument against Committee's copyright claim, Respect says that before Committee could even arguably have gained a copyright Mast made a copyright transfer to Hofmeister, who later assigned all the rights back to Mast and Respect. Respect contends that under those circumstances the legal rules governing conflicting transfers govern the situation. It is true that much of copyright law is technical in nature, so that it could perhaps override equitable considerations that might otherwise point to a different result. On the other hand, the drawing of all factual inferences in Committee's favor might arguably call into play one or more defenses to Respect's technical position described in this footnote (for example, a defense based on the application against Respect of a doctrine similar to the property concept of estoppel by deed). But that entire area of controversy need not be dealt with, given this opinion's conclusion that rejects Committee as the copyrights' owner.

6. If the money that Committee paid to Mast was not for writing the books but for other services instead, then by definition she and not Committee would own the copyrights, eliminating any need for further analysis.

7. This citation form is somewhat contrived, because 17 U.S.C. § 101 actually strings together an entire series of definitions without numbering or lettering them separately. As a result, there are a number of terms defined with subparts—all of course numbered (1), (2) and so on. Thus "101(1)" could be taken to refer to a number of provisions in the same statutory section. Because this opinion deals only with the statutory definition of "work made for hire," no confusion should be caused by a usage that would otherwise be quite ambiguous.

"prepared by an employee within the scope of his or her employment" (Act § 101(1), defining work made for hire as that phrase is employed in Act § 201(b)). Alternatively the organization may also own the copyright of a work developed by a nonemployee (1) if the parties have agreed in writing that the work should be deemed a work made for hire and (2) if the work falls within the categories set forth in the statutory definition of that term (Act § 101(2)).

*Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989) ("*CCNV*") teaches that the legal status (that is, employee v. independent contractor) of the compensated party—an issue decided by referring to common law agency principles[8] (see *CCNV* at 750–51, 109 S.Ct. at 2178, followed in a different context in *Nationwide Mut. Ins. Co. v. Darden,* ── U.S. ──, ──, 112 S.Ct. 1344, 1348, 117 L.Ed.2d 581 (1992))—determines how the work-made-for-hire provisions operate. If the creator is found to be an employee, Act § 101(1) applies and the organization that engaged him or her owns the copyright, unless of course a written agreement to the contrary exists (Act § 201(b)). If however the creator was an independent contractor, Act § 101(2) applies.[9] Under that provision the organization owns the copyright only if the work fits within one of a group of nine specifically enumerated groups *and* if the "parties expressly agree[d] in a written instrument signed by them that the work shall be considered a work made for hire."[10]

Here is how *CCNV,* 490 U.S. at 751–52, 109 S.Ct. at 2178–79 (footnotes omitted), drawing on the Restatement and citing numerous cases, has spoken of the first step in the analysis:

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

Those factors are nonexhaustive, and no one consideration is determinative (*id.* at 752, 109 S.Ct. at 2178–79). And as *Aymes v. Bonelli,* 980 F.2d 857, 861 (2d Cir.1992) has recently pointed out:

> It does not necessarily follow that because no one factor is dispositive all factors are equally important, or indeed that all factors will have relevance in every case. The factors should not merely be tallied

---

**8.** As did *CCNV* and as have other courts (see, e.g., *Marco v. Accent Pub. Co.,* 969 F.2d 1547 (3d Cir.1992)), this Court turns to the Restatement (Second) of Agency (1958) ("Restatement") for guidance in analyzing common law agency principles. "Servant," as the Restatement employs it, is synonymous with the Act's use of "employee" (see *Marco,* 969 F.2d at 1549 n. 2).

**9.** Respect's memorandum for summary judgment demonstrates a misunderstanding of that sequential analysis. Instead of discussing Mast's proper legal status and then applying the appropriate Act subsection, it argues *first* that "the Textbooks were specially ordered instructional texts under part two of the definition of 'work-made-for-hire'" (P.Mem. 7–8) and therefore were not works made for hire because no writing evi-

denced an agreement on that characterization. But as *CCNV* has explained, any resort to that subsection and the accompanying analysis is inappropriate until after the creator's legal status has been determined.

**10.** *Schiller & Schmidt, Inc. v. Nordisco Corp.,* 969 F.2d 410, 413 (7th Cir.1992) has recently summarized the analysis in exactly the same way:

> The creator of the property is the owner, unless he is an employee creating the property within the scope of his employment or the parties have agreed in a writing signed by both that the person who commissioned the creation of the property is the owner. The writing must precede the creation of the property in order to serve its purpose of identifying the (noncreator) owner unequivocally.

but should be weighed according to their significance in the case.[11]

No more is required than to look at such cases as *CCNV* itself, *Aymes*[12] and the recent Third Circuit decision in *Marco* (see n. 8)—all ascribing independent contractor status to the creators of the works involved, despite the presence in those cases of *more* factors that would be consistent with an employer-employee relationship than existed in the Committee–Mast arrangement—to see that Mast too was *not* an employee in Act § 101(1) terms. And that conclusion clearly applies even with the required reasonable inferences drawn in Committee's favor.

Well before Committee came onto the scene, Mast was an experienced teacher who was at the forefront of abstinence education. When she entered into discussions with Committee she continued to act as an entrepreneur, dealing with UCA on her own behalf. And the nature of her arrangements with Committee as to her completion of the books simply lacked the hallmarks of common law employment.

Though Committee did have a limited kind of input to the books—for example, by suggesting revisions—it did not even begin to approach the level of composition control present in *Marco* or of planning and detail control present in *CCNV.* It was Mast and not Committee who was responsible for the books' content and flavor.

As was true of the creators in *CCNV* and *Marco,* Mast did the bulk of her work at her own home and office. Neither Mast's office nor her home were so proximate to Committee's office as to permit the latter's control of how and when Mast worked.

Some dispute exists over ownership of some of the tools—for instance each party claims some sort of proprietary right to Mast's typewriter, which Mast picked out and purchased but for which Committee reimbursed her. Similar disagreement exists over just who it was that hired assistants, because even though Mast selected typists without approval Committee did reimburse her for typing costs and for the help of an editor. But those minor quarrels are really nonmaterial, for there is no doubt that Mast worked from her own research materials (the principal weapon in an author's arsenal), maintained her own supplies and file cabinets and controlled the books' layout.

Nor was Committee a business in the normal (or commercial) exercise of the term—clearly it did not have a history of employing persons like Mast or of publishing textbooks, factors that would cut in its favor. Instead, rather uncommonly, Committee (at least in part) regenerated itself because the opportunity arose to commission Mast.

In an effort to bootstrap itself into the posture of an employer, Committee implies that it could have assigned more book writing to Mast. But that contention is wholly unsupported in the objective evidence (including the documents between the parties). And Mast testified without contradiction that she in fact produced and published other works (for herself and Respect—not for Committee) during the period at issue.

As for the mode of Commission's payment to Mast, it is wholly consistent with payments for commissioned works—entirely comparable to those in *CCNV* and *Marco,* for example. Nor is that really undercut by the fact that Committee withheld payroll taxes from Mast's checks. Mast, who did not receive employee benefits in the customary use of the term, explained without contradiction that parties who retained her to consult or lecture often withheld her taxes. It should be remembered that *CCNV,* 490 U.S. at 751–52, 109 S.Ct. at 2178–79 mandates consideration of all the factors—and under the summary judgment standard prescribed in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986) (akin to that for what

11. [Footnote by this Court] *Aymes, id.* at 861–62 also sought to structure a kind of weighted approach under which (to crib from the classic sentence in Orwell's *Animal Farm* ) some factors are more equal than others. For purposes of this opinion it is unnecessary to decide whether that gloss should be superimposed on what the ulti-mate authority—the Supreme Court—has said in *CCNV.*

12. *Aymes, id.* at 861 also sets out a string cite of post-*CCNV* work-made-for-hire cases. Any review of those authorities also buttresses the decision reached in the text.

used to be called a directed verdict under Rule 50(a)), the feather in the scales represented by Committee's tax withholding is insufficient to require a trial on whether Mast was an independent contractor or an employee.

Because Mast was thus an independent contractor as a matter of law, *CCNV* requires resort to Act § 101(2) rather than to Act § 101(1). And that provision creates work-made-for-hire rights only (1) if the product falls within one of nine enumerated categories (which, crediting Committee with favorable inferences for Rule 56 purposes, it does as an "instructional text") and (2) if the parties agreed that in writing that the product would be a work made for hire. Unquestionably Respect and Mast never did the latter. Hence Committee has no rights stemming from the work-made-for-hire statutes.

### 2. Joint Authorship

■ Respect and Committee diverge just as sharply on whether the books were joint works.[13] Joint authors are "coowners of copyright in the work" (Act § 201(a)), and characterization as a joint author is accompanied by substantial benefits. Joint authors hold an undivided interest in copyright-protected work—that is, coownership constitutes partial ownership of the entire copyright in the work, notwithstanding any differences in contribution among the authors—as well as other rights of authorship (see *Childress v. Taylor*, 945 F.2d 500, 505 (2d Cir.1992)). Importantly "[e]ach coowner of a copyright may revise the work (that is, make a derivative work) and publish the original or the revision" (*Weinstein v. University of Illinois*, 811 F.2d 1091, 1095 (7th Cir.1987)). Thus crediting a minor contributor with joint-authorship status confers substantially greater benefits than the relative amount of his or her effort.

Under the Act a joint work is "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole" (Act § 101). "Inseparable" and "interdependent" are distinct concepts, as *Childress*, 945 F.2d at 505 makes plain:

> Parts of a unitary whole are "inseparable" when they have little or no independent meaning standing alone. That would often be true of a work of written text, such as the play that is the subject of the pending litigation. By contrast, parts of a unitary whole are "interdependent" when they have some meaning standing alone but achieve their primary significance because of their combined effect, as in the case of the words and music of a song.

One small portion of the statute's legislative history seems somewhat at odds with the statutory language itself (H.R.Rep. No. 1476, 94th Cong., 2d Sess. 120 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5736; S.Rep. No. 473, 94th Cong., 2d Sess. 103 (1975) (emphasis added)):

> [A] work is "joint" if the authors collaborated with each other, *or* if each of the authors prepared his or her contribution with the knowledge and intention that it would be merged with the contributions of other authors as "inseparable or interdependent parts of a unitary whole." The touchstone here is the intention, at the time the writing is done, that the parts be absorbed or combined into an integrated unit.

But *Childress*, 945 F.2d at 505–06 has explained why that suggestion of a disjunctive standard (which, it will be observed, does not really jibe with the stated "touchstone" of intention) should not be taken in that sense:

> This passage appears to state two alternative criteria—one focusing on the act of collaboration and the other on the parties' intent. However, it is hard to imagine activity that would constitute meaningful "collaboration" unaccompanied by the requisite intent on the part of both participants that their contributions be merged into a unitary whole, and the case law has read the statutory language literally so that the intent requirement applies to all works of joint authorship.

---

**13.** Committee does not itself claim to have contributed copyrightable work. It rather relies on the work of two individuals who have assigned their rights of joint authorship, if any exist, to Committee. That is enough to raise the joint authorship issue.

■ Now to the task at hand. By definition the party raising the joint-authorship claim (or defense) must be an "author" of the copyrightable work.[14] Although the Act does not define "author," the Supreme Court—distilling a definition from the constitutional use of the word in U.S. Const. art. I, § 8, cl. 8—long has construed the term to mean "he to whom anything owes its origin" (*Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 58, 4 S.Ct. 279, 281, 28 L.Ed. 349 (1884)).

It necessarily follows (from both constitutional as well as statutory sources) that a contributor must have contributed something original to be deemed an author for purposes of the Act. Originality as a requirement is not overly exacting (see, e.g., 1 Nimmer §§ 2.01[A], [B] (1992)). *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, —— U.S. ——, ——, 111 S.Ct. 1282, 1287, 113 L.Ed.2d 358 (1991) (citation omitted) explains:

Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity. To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice.

But despite that low threshold, originality remains a requirement that must be met (see *id.* —— U.S. at ——, 111 S.Ct. at 1294 ("Presumably the vast majority of compilations will pass this test, but not all will.")).

■ As with the other potential issues that this opinion has already identified without having to resolve, this Court eschews consideration of whether the "originality" threshold was surmounted by the two contributors on whom Committee must rely. That is because Committee founders on the "touchstone" requirement that *each* joint author must have possessed the requisite intent at the time of contribution. Even though the statutory language might be read as asking only whether the putative co-authors intended a unitary finished work, the cases have taken a different view. As *Fisher v. Klein*, 16 U.S.P.Q.2d 1795, 1798 (S.D.N.Y.1990) has put it:

It is only where that dominant author intends to be sharing authorship that joint authorship will result.[15]

Were that not the case, the Act would extend joint author status to many who are plainly beyond its intended scope. As *Childress*, 945 F.2d at 507 explains:

[A] writer frequently works with an editor who makes numerous useful revisions to the first draft, some of which will consist of additions of copyrightable expression. Both intend their contributions to be merged into inseparable parts of a unitary whole, yet very few editors and even fewer writers would expect the editor to be accorded the status of joint author, enjoying an undivided half interest in the copyright in the published work. Similarly, research assistants may on occasion contribute to an author some protectable expression or merely a sufficiently original selection of factual material as would be entitled to a copyright, yet not be entitled to be regarded as a joint author of the work in which the contributed material appears. What distinguishes the writer-editor relationship and the writer-researcher relationship from the true joint author relationship is the lack of intent of both participants in the venture to regard themselves as joint authors.

Here the record—despite all reasonable inferences in Committee's favor—leaves no doubt that Mast never intended to make

---

14. This opinion need not address the much-mooted question of whether the contribution of each joint author must be copyrightable or whether the statute (and its underlying constitutional requirement of originality) are satisfied when the combined result of their joint efforts is copyrightable (contrast 1 Melville Nimmer & David Nimmer, *Copyright* § 6.07 (1992) ("Nimmer") with 1 Paul Goldstein, *Copyright: Principles, Law and Practice* § 4.2.1.2 (1989); and see also *Childress*, 945 F.2d at 506 (collecting cases)).

15. [Footnote by this Court] That inquiry takes on special significance where one person is unquestionably the dominant author and the issue is whether that person is the sole author or a joint author, as that term is used in the Act (see *Picture Music, Inc. v. Bourne, Inc.*, 314 F.Supp. 640, 647 (S.D.N.Y.1970), *aff'd on other grounds*, 457 F.2d 1213 (2d Cir.1972)).

anyone else a joint author. Courts routinely state that summary judgment is disfavored where intent is in issue (see, e.g., this Court's statement in *Quaker Alloy Casting Co. v. Gulfco Indus., Inc.*, 686 F.Supp. 1319, 1342 (N.D.Ill.1988) that summary judgment is impossible where intent "is genuinely in dispute"). This Court—while understanding the foundations of that proposition and while recognizing that it makes the moving party's task more difficult (a point often made in the Title VII and antitrust areas)—has reiterated that the need to ascertain intent as a primary issue does not negate the possibility that summary judgment will be appropriate (see, e.g., *Stotler & Co. v. Sonnenschein*, 703 F.Supp. 686, 695 n. 13 (N.D.Ill.1988) ("Summary judgment *is* unquestionably available even where intent is in issue.")). Indeed, *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514 has expressly rejected the notion that a party "should seldom if ever be granted summary judgment where his state of mind is at issue and the jury might disbelieve him or his witnesses as to this issue"—instead there must be "evidence from which a jury might return a verdict in [the other party's] favor" (*id.* at 257, 106 S.Ct. at 2514).

Certainly Mast could not have made her intention more plain than by the way she billed herself in each of the books, both by stating that they were "by Coleen Kelly Mast" and by the legend "Copyright © 1986 by Coleen Kelly Mast." [16] As with every judicial inquiry into intent, such objective evidence usually provides the most reliable clue to a person's mindset. And in this instance there is simply no evidence—either objective or subjective—that points in the other direction.

Accordingly no rational trier of fact could conclude that Mast had the state of mind that is a prerequisite to a finding of joint authorship. Committee has struck out on that ground as well as on its work-made-for-hire contention. As a matter of law, then, Respect and not Committee owns the copyrights in all of the books.

*Regulation § 74.145(c)*

■ Committee has advanced a fallback argument for consideration if it were to lose (as it now has) on the copyright ownership issue. It points to 45 C.F.R. § 74.145(c) ("Reg. § 74.145(c)" or "the Regulation") as assertedly granting Committee (derivatively through HHS [17]) an unrestricted right to reproduce and distribute the books itself:

> *HHS rights.* If any copyrightable material is developed in the course or under a HHS grant or subgrant HHS shall have a royalty-free, nonexclusive, and irrevocable right to reproduce, publish, or otherwise use, and authorize others to use, the work for Federal government purposes. A grantee awarding a subgrant may reserve a similar right for itself with respect to copyrightable material developed under that subgrant.

In response to that contention, Respect argues principally (1) that the Regulation is invalid and also (2) that it does not apply because the books were not developed under the grant.

In this Court's view it is neither necessary nor appropriate to invalidate the Regulation as a whole. Serious due process considerations could be implicated by imposing any such total invalidation without the United States having been present to speak to the issue.[18] And after all, what is at issue here is

**16.** Committee, which appropriately places great emphasis on the book's statement that Sex Respect was developed under a government grant, would have this Court pay little or no attention to the authorship and copyright legends just quoted in the text. Even the most expansive notion of drawing all reasonable inferences in favor of the nonmovant on a summary judgment motion cannot justify such a schizoid treatment of a single document.

**17.** Committee's February 11, 1987 letter to Gasper explicitly requested HHS' permission to sell the books. Gasper's March 17, 1987 reply grant-

ed that permission, albeit with certain restrictions on use of the receipts. Committee concedes that it then proceeded to publish and distribute the books.

**18.** Compare the requirement in 28 U.S.C. § 2403(a) that the United States Attorney General must be notified and the United States must be permitted to intervene whenever "the constitutionality of any Act of Congress affecting the public interest is drawn in question...."

not the aspect of the Regulation that reserves a royalty-free license to the United States itself. Instead, it is the nature of Gasper's attempted grant to *Committee* that runs afoul of the only congressional enactment that has been pointed to by HHS and now by Committee as having granted authority for promulgating the Regulation.

■ One related threshold point should be made before turning to that discussion. Neither party has focused on the most logical reading of Reg. § 74.145(c)—one that highlights the impermissibly expansive action that Gasper took at Committee's request. As the Regulation reflects, HHS seeks to retain a threefold nonexclusive license in any grant-developed copyrightable works: the "right to reproduce, publish or otherwise use...." That trilogy matches the time-honored and firmly-established trilogy that exists in the sister area of intellectual property rights, the law of patents. It has long been universally understood that the terms "make," "use" and "sell" (the terms employed by Congress in 35 U.S.C. §§ 154 and 271(a)) embody independent and distinct rights in the subject matter of any patent (among the many cases so holding over the span of many years are *Bauer & Cie v. O'Donnell*, 229 U.S. 1, 10–11, 33 S.Ct. 616, 617, 57 L.Ed. 1041 (1912) and *Roche Prod. v. Bolar Pharmaceutical Co.*, 733 F.2d 858, 861 (Fed.Cir.1984)).

That conceptual separateness has obvious relevance to what is now at issue. In the language employed in the Regulation, to "reproduce" a copyrighted work obviously corresponds to "making" a patented device. To "publish" a copyrighted work just as clearly corresponds to "selling" the patented device. And to "use" a copyrighted work needs no doctrine of equivalents to match the independent concept of "use" in the patent analogy (there is no need to call on Gertrude Stein's "Rose is a rose is a rose" for authority).[19] And importantly the *only* power that the

Regulation would confer on HHS to grant benefits to nongovernmental third parties involves the authorization to *use* the copyrightable work—not either of the other two distinct rights (to reproduce and to publish the books), which if conferred would extend to commercial exploitation. Any other reading of the Regulation would permit the government, even though it was merely a nonexclusive licensee, to put others into business in direct competition with the copyright's owner on a royalty-free basis. That would turn the law of copyrights on its head.

With that in mind, this opinion is ready to turn to the issue of validity of the Regulation—but first it may be worth spending another preliminary moment or two to identify other issues that this opinion is *not* called upon to settle. By way of background, there is of course no question that properly issued substantive agency regulations have the force of law (*Chrysler Corp. v. Brown*, 441 U.S. 281, 295, 99 S.Ct. 1705, 1714, 60 L.Ed.2d 208 (1979)). And just as clearly, Reg. § 74.145(c) is substantive (as opposed to interpretive), for it affects "individual rights and obligations" (*id.* at 302, 99 S.Ct. at 1718). Nor is there any question as to the Regulation's adoption in accordance with the required procedural limitations (*id.* at 303, 99 S.Ct. at 1718)—here those contained in the Administrative Procedure Act ("APA").

With those non-issues viewed as given, what also need not be resolved to decide the present motion is a proposition stated by Respect and not responded to at all by Committee. As to the source of authority for adoption of a legally binding regulation—the delegation to the administrative agency—*Chrysler, id.* at 308, 99 S.Ct. at 1720 said this:

This is not to say that any grant of legislative authority to a federal agency by Congress must be specific before regulations promulgated pursuant to it can be binding on courts in a manner akin to statutes.

---

19. Only a moment's reflection tells the reader that the Regulation's inclusion of the word "otherwise" before the word "use" does not convert the latter into a generic term that swallows up the antecedent terms "reproduce" and "publish." Instead the common sense of the matter is that the most frequent ways in which powers are

exercised as to a copyrightable work are to reproduce it and to publish it. Because there is a third possible type of activity—the purely internal "use" of the work for one's own purposes—the Regulation also covers that by including the modifier "otherwise."

What is important is that the reviewing court reasonably be able to conclude that the grant of authority contemplates the regulations issued.

Respect's initial Mem. 6 sought to cabin that concept in this fashion:

> [A] regulation may only be upheld on the authority relied on by the agency. *S.E.C. v. Chenery*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943); *Bowen v. American Hospital Assoc.*, 476 U.S. 610, 106 S.Ct. 2101, 90 L.Ed.2d 584 (1986).

Although Committee did not challenge that statement, this Court must at least disclaim having to embrace its broad sweep as a basis for decision here.[20]

■ Thus having eliminated the numerous byways that could have detoured its arrival at the ratio decidendi for today's decision, this Court's road to that destination is short indeed. It remains a fundamental principle of administrative law that agencies may not self-levitate their power to promulgate regulations—they must rather find any such power in a source conferred by Congress. Committee impermissibly refers to Title XX of the Public Health Service Act, entitled Adolescent Family Life Demonstration Projects (42 U.S.C. §§ 300z to 300z–10[21]), as having granted the authority for the Regulation. But any purported reliance on that source is totally bizarre, given the fact that the Regulation was promulgated in 1980 and Title XX was not enacted until more than a year later—in August 1981. All that HUD itself identified as its source of authority for issuance of the Regulation (see 45 C.F.R. Part 74, 45 Fed.Reg. 22577 (Apr. 3, 1980)) was 5 U.S.C. § 301 ("Section 301"). And except for its own groundless reference to Title XX, Committee points to nothing other than Section 301. This Court's own effort to ascertain other reasonable possibilities (a task that is really for litigant Committee, not for this Court, to discharge) has disclosed no other potential power source, and this Court is not about to endeavor on a full-blown exploration into the abyss of the United States Code in search of one on Committee's account.

Here is Section 301:

> ·The head of an Executive department or military department may prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property. This section does not authorize withholding information from the public or limiting the availability of records to the public.

Understandably that provision—whose antecedents actually date back to President Washington's administration—is commonly referred to, as it was in *Chrysler*, 441 U.S. at 309, 99 S.Ct. at 1721), as the "housekeeping statute." *Chrysler* has left no doubt that Section 301 is not an unrestricted grant of authority on which agencies may base substantive regulations. On the contrary, Section 301 "is indeed a 'housekeeping statute,' authorizing what the APA terms 'rules of agency organization, procedure or practice' as opposed to 'substantive rules' " (*Chrysler*, 441 U.S. at 310, 99 S.Ct. at 1721).

So it is that Section 301 may properly serve as authority for a regulation that governs *internal* agency matters, such as the filing of government documents pertaining to the day-to-day business of government (*id.* at 309 n. 39, 99 S.Ct. at 1721 n. 39). In terms of the Regulation at hand, Section 301 could thus be fairly read as authorizing the internal agency use of a copyright-protected work that was developed with government funds.

**20.** Respect cites no Seventh Circuit law on the point. Conflicting signals have emanated from the Court of Appeals for the District of Columbia, which finds administrative law issues on its plate far more often than any other Court of Appeals (contrast *Media Access Project v. FCC*, 883 F.2d 1063, 1067 (D.C.Cir.1989) with *Business Roundtable v. SEC*, 905 F.2d 406, 417 (D.C.Cir.1990)). In *Chrysler*, 441 U.S. at 303, 309 n. 39, 99 S.Ct. at 1718, 1721 n. 39 the Supreme Court itself looked to whether 5 U.S.C. § 301 provided sufficient authority for the regulation at issue, even though the Secretary of Labor had not pointed to that statute in his published memoranda identifying the claimed authority for the regulations. And it did so without mentioning the *Chenery* rule at all.

**21.** That legislation has been moved from its original classification as subchapter XX of Chapter 6A of Title 42 to its present place as subchapter XVIII of the same Chapter 6A.

1124

It would involve a somewhat greater stretch of the statutory language (and of the reading of that language in *Chrysler* and other cases) to extend that authorization to the agency's *external* exploitation of the copyrighted work—but for the reason stated at the very beginning of this section, this Court need not and will not seek to resolve that issue either for or against the nonparty United States. All that this case requires is the compelled conclusion that it would give the lie to Section 301's clear language, to its legislative history and to its reading in *Chrysler* and other cases if the statute were construed to authorize the government to give commercial rights to third parties such as Committee.

This Court accordingly holds that Section 301 simply did not authorize HHS to adopt a regulation that would permit it to grant Committee rights so directly at war with Mast's copyright. And as stated earlier, the more logical reading of the Regulation itself is that no such creation of broad third-party rights was within its scope—that Gasper exceeded her own authority when she gave Committee permission to print and distribute the books to the economic detriment of Respect as the copyright owner.

*Conclusion*

Respect owns the copyrights to the books. Committee has not given this Court a proper basis for HHS' having granted it privileges of commercial use contrary to those rights, and this Court will not search one out. There is no genuine issue of material fact, and Respect is entitled to a judgment as a matter of law on Count I. Committee's corresponding motion for summary judgment is of course denied.