**HI–TECH VIDEO PRODUCTIONS, INC., Plaintiff–Appellee,**

v.

**CAPITAL CITIES/ABC, INC., Defendant–Appellant.**

No. 93–1090.

United States Court of Appeals, Sixth Circuit.

Argued May 3, 1994.

Decided July 11, 1995.

Rehearing Denied Aug. 3, 1995.

F.Supp. 1294, 1298 (E.D.Tenn.1992), *aff'd sub nom. Myers v. United States,* 17 F.3d 890 (6th Cir.1994).

James M. Hunt, Graff & Hunt, Traverse City, MI (argued and briefed), for plaintiff-appellee.

Herschel P. Fink (argued and briefed), Michael A. Gruskin, Honigman, Miller, Schwartz & Cohn, Detroit, MI, for defendant-appellant.

Before: JONES and BATCHELDER, Circuit Judges; GILMORE, District Judge.*

BATCHELDER, J., delivered the opinion of the court, in which GILMORE, D.J., joined. JONES, J. (pp. 1099–1100), delivered a separate dissenting opinion.

ALICE M. BATCHELDER, Circuit Judge.

Hi–Tech Video Productions, Inc. ("Hi–Tech"), filed suit against Capital Cities/ABC, Inc. (ABC), alleging a single count of copyright infringement. At the close of a two-day bench trial, the district court denied from the bench ABC's motion to dismiss the complaint due to the invalidity of Hi–Tech's copyright. The district court subsequently entered judgment in favor of Hi–Tech. *Hi–Tech Video Prods., Inc. v. Capital Cities/ABC, Inc.*, 804 F.Supp. 950 (W.D.Mich. 1992). In so doing, the district court rejected ABC's affirmative defense of fair use, trebled the award of damages in light of ABC's "willful" infringement of copyright,

and awarded Hi–Tech attorney's fees and costs. The district court later denied ABC's motion for a new trial or for reconsideration of the bench ruling on copyright validity and of the judgment for Hi–Tech.

ABC filed this appeal contesting the district court's rulings on copyright validity, fair use, treble damages, and attorney's fees and costs. Because we find Hi–Tech's copyright invalid, we reverse the judgment below without reaching ABC's other assignments of error.

### I.

Hi–Tech is a production company in Traverse City, Michigan. In addition to contractual work, such as the creation of commercials and other promotional tapes for companies, Hi–Tech independently produces and distributes "video postcards" of northern Michigan vacation spots.

In May 1990, Hi–Tech released a travel video entitled "Mackinac Island: The Mackinac Video." Stan Akey, sole owner of Hi–Tech, produced and directed the video. He enlisted the help of freelance subcontractors: Ted Cline as aerial videographer, Steve Cook as scriptwriter/narrator, and Michael Mueller as principal videographer. As one of Hi–Tech's independent productions, the Mackinac video received its funding from Hi–Tech itself, not from a commercial client. Effective August 3, 1990, Hi–Tech registered a copyright in the Mackinac video as a "work made for hire."

Also in early 1990, the producers of "Good Morning America" (GMA), a news and information program on ABC, decided to feature Mackinac Island's annual Lilac Festival in GMA's June 8, 1990, broadcast. Donna Vislocky, then an associate producer of GMA, was charged with preparing a one-minute videotape on Mackinac Island and its history. Twice, Vislocky obtained footage of the island from an ABC affiliate in Traverse City. Two days before the air date, Vislocky determined the scenes to be insufficient.

---

* The Honorable Horace W. Gilmore, District Judge for the Eastern District of Michigan, sitting by designation.

Vislocky telephoned Sarah Bolger, Executive Director of the Mackinac Island Chamber of Commerce. Bolger sent Vislocky two videos, including the Mackinac video, via overnight mail. Upon receiving the videos, Vislocky identified scenes from Hi–Tech's video that were appropriate for use in GMA's background piece on Mackinac Island. Vislocky rearranged those scenes for use in the background piece but did not use Hi–Tech's narration or music.[1]

The next morning, Spencer Christian of GMA reported the weather from Mackinac Island and conducted an interview of Bolger regarding the annual Lilac Festival. Introducing Christian's segment was the background piece that Vislocky had edited to include scenes from the visual portion of Hi–Tech's video.

## II.

■ To sustain a case of copyright infringement, the plaintiff must prove "(1) ownership of a valid copyright, and (2) copying [by the defendants] of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 1296, 113 L.Ed.2d 358 (1991); *Wickham v. Knoxville Int'l Energy Exposition, Inc.*, 739 F.2d 1094, 1097 (6th Cir.1984). Hi–Tech's certificate of copyright creates a presumption of the copyright's validity. 17 U.S.C.A. § 410(c) (1977). Although the presumption may be rebutted, it is the burden of the party challenging the copyright to do so. *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 831 (10th Cir.1993).

Hi–Tech's certificate of copyright registration labels the Mackinac video a "work made for hire." In the case of a "work made for hire," the Copyright Act of 1976 ("the Act") considers the employer or person for whom the work was prepared to be the "author" for purposes of copyright registration and ownership. 17 U.S.C.A. § 201(b) (1977). Section 101 of the Act defines a "work made for hire" in two ways:

(1) a work prepared *by an employee* within the scope of his or her employment; or

(2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, *if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.* . . .

17 U.S.C.A. § 101 (1977) (emphasis added).

Hi–Tech does not claim that the parties signed a written agreement to consider the video a "work made for hire." Thus, we are not asked to find Hi–Tech's copyright valid under § 101(2) of the Act. With respect to § 101(1), ABC does not argue that, if indeed prepared by employees as opposed to independent contractors, the work was not prepared in the scope of the employees' employment. Therefore, Hi–Tech's copyright is a valid "work made for hire" if we conclude it was prepared by employees, not independent contractors.

■ The district court found Akey's assistants in the production of the video to be employees within the meaning of § 101(1). This Court conducts a *de novo* review of the district court's application of § 101(1) to the facts of the case. *See Marco v. Accent Publishing Co.*, 969 F.2d 1547, 1548 (3d Cir. 1992); *Aymes v. Bonelli*, 980 F.2d 857, 861 (2d Cir.1992).

## III.

■ The United States Supreme Court construed the "work made for hire" provision in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989) (hereinafter *CCNV*), and concluded that the term "employee" in § 101 must be understood through application of the general common law of agency. *Id.* at 740–41, 109 S.Ct. at 2172–73. The Court

---

1. Vislocky later contended that she received permission for such use from the Chamber of Commerce, which she believed owned the video. The district court resolved this factual issue against ABC. In light of our conclusion on the copyright's validity, we do not express an opinion on the district court's factual findings with respect to the circumstances of ABC's use.

then set forth a nonexclusive list of factors relevant to the determination of "employee" status:

(1) the hiring party's right to control the manner and means by which the product is accomplished;

(2) the skill required;

(3) the source of the instrumentalities and tools;

(4) the location of the work;

(5) the duration of the relationship between the parties;

(6) whether the hiring party has the right to assign additional projects to the hired party;

(7) the extent of the hired party's discretion over when and how long to work;

(8) the method of payment;

(9) the hired party's role in hiring and paying assistants;

(10) whether the work is part of the regular business of the hiring party;

(11) whether the hiring party is in business;

(12) the provision of employee benefits; and

(13) the tax treatment of the hired party.

*See id.* at 751–52, 109 S.Ct. at 2178–79 (footnotes omitted). No single factor is determinative. *Id.*

■ In finding "employee" status in this case, the district court relied on six of the above factors: Hi–Tech's right to control and actual control, the source of the instrumentalities, Hi–Tech's right to assign additional projects, the assistants' role in hiring and paying their own assistants, the scope of Hi–Tech's regular business, and Hi–Tech's status as a business. The court mentioned several factors that weigh in favor of independent contractor status, but summarily found them insufficient to affect its conclusion that an employer-employee relationship existed between Akey and his assistants.[2]

■ The district court clearly erred in two of its factual findings. First, the district court found that Akey supplied the produc-

tion equipment to his assistants. To the contrary, the record shows that Cline, the aerial videographer, supplied his own plane, which was specially equipped to accommodate aerial photography. Also, Akey provided the camera for principal photographer Mueller, but not the computer with which Mueller developed the video's graphics.

Second, the district court found that Akey retained the right to assign additional projects to his assistants. The record does not support this finding. While Akey may have previously engaged one or more of his Mackinac video assistants for other projects, there is no suggestion that Cline, Cook, and Mueller were bound to accept assignments unrelated to the Mackinac video. Rather, the record indicates that Akey hired Cline, Cook, and Mueller to make specific contributions to the Mackinac video only. For example, Akey testified that when a "particular job ... comes out," he hires "freelance people" to assist with "that project." Akey also testified that Mueller's primary occupation is in the computer field, but that Mueller takes on "contractual jobs" in the photography field as well. Indeed, Akey testified that Cline, too, has his own business of flying his Cessna for aerial photography.

More importantly, the district court erred as a matter of law in its application of the common law of agency to the facts of this case. The district court misapprehended the Supreme Court's statement that no single factor is conclusive in the agency analysis and improperly used this principle to dismiss the relative importance of several factors. As one court has said of *CCNV,*

> It does not necessarily follow that because no one factor is dispositive all factors are equally important, or indeed that all factors will have relevance in every case. The factors should not merely be tallied but should be weighed according to their significance in the case.

*Aymes v. Bonelli,* 980 F.2d 857, 861 (2d Cir.1992); *see CCNV,* 490 U.S. at 742–43, 752, 109 S.Ct. at 2173–74, 2179. We agree

---

**2.** We cannot agree with the dissent's characterization of Akey as an employee of Hi–Tech. Hi–Tech is a business venture owned and operated solely by Akey. Thus, Akey is not an employee of Hi–Tech; Akey *is* Hi–Tech.

with the Second Circuit's approach to applying the factors in the agency analysis. The factors that warrant significant weight in this case are discussed below.

### A. The Right to Control, Actual Control, and Skill Required

In *CCNV*, the Supreme Court adopted the agency principles test and rejected the tests that made the right to exercise control over production, or the actual exercise of control, dispositive in the "work made for hire" analysis. 490 U.S. at 742–43, 748, 109 S.Ct. at 2173–74, 2176. Nevertheless, the Supreme Court retained the "control" factor as simply one of the many relevant factors. *Id.* at 751, 109 S.Ct. at 2178.

In this case, Hi–Tech, through its sole proprietor Stan Akey, had the right to control the manner and means by which the video was completed. Akey exercised this right through his involvement in almost every step of the creative and administrative processes required to produce "Mackinac Island: The Video."

Nevertheless, while Akey may have had control of the artistic objectives of the project, it is also true that Akey relied on the skill of the artists he solicited to accomplish those objectives. In Akey's own words, he "coordinate[d] the entire project from its inception to completion, the creative input into the tape, and coordinate[d] the efforts of all the freelance people who worked with [him]." Akey further testified that he considered himself the producer and director of the Mackinac video and that he depended on each assistant's "creative, artistic ability" in his particular field.

Akey's control of the video production thus weighs in favor of finding an employer-employee relationship, but not significantly, in light of the skill required of the assistants, as well as the assistants' artistic contributions to the product. *See Marco*, 969 F.2d at 1552.

### B. Method of Payment, Employee Benefits, and Tax Treatment

In virtually every case, a strong indication of a worker's employment status can be garnered through examining how the employer compensates the worker (including benefits provided) and how the employer treats the worker for tax purposes. For example, in *Aymes*, 980 F.2d 857, the hiring party provided a computer programmer no benefits and withheld neither social security nor federal or state income taxes. The Second Circuit reasoned that the choice to treat a skilled worker as an independent contractor for compensation and tax purposes was entirely inconsistent with an employer-employee relationship. *Id.* at 862–63.

The record reveals that Akey paid Mueller on a per diem basis. Regular wages, as opposed to payment by the job, suggest employee status, but the fact that Mueller worked on the Mackinac video for only five days suggests otherwise. The record does not specify the method of payment for Cline and Cook. Overall, the evidence on the method of payment is indeterminate.

However, the same cannot be said of the other relevant economic factors. Akey neither withheld payroll taxes from his assistants' compensation nor provided the assistants employment benefits such as medical or life insurance. Contrary to the district court's analysis, these factors weigh very heavily in favor of finding independent contractor status.

### C. Perceptions of the Parties

In applying the common law of agency to copyright cases, the Supreme Court typically refers to the Restatement of Agency for guidance. *CCNV*, 490 U.S. at 752 n. 31, 109 S.Ct. at 2179 n. 31; *see also Marco*, 969 F.2d at 1550 (drawing on *CCNV* and the Restatement). In addition to the factors listed above, the Restatement cites the parties' perceptions or understanding as relevant to a worker's employment status. Restatement (Second) of Agency § 220(2)(i) (1957).

Akey is the only full-time employee of Hi–Tech. He testified that when the need arises for a production team, he hires "freelance people," including photographers, scriptwriters, musicians, and narrators. In his testimony, Akey referred to his assistants on the Mackinac video as "freelancers," "independent contractors," "subcontractors," or the like no fewer than eight times. Akey also

specifically stated that the assistants were not his employees.

The district court did not accord any weight to Akey's understanding of his employment relationship with the assistants. This Court considers Akey's perceptions highly indicative of his assistants' independent contractor status. *See Easter Seal Soc'y for Crippled Children and Adults of La., Inc. v. Playboy Enter.*, 815 F.2d 323, 336 (5th Cir.1987),[3] *cert. denied,* 485 U.S. 981, 108 S.Ct. 1280, 99 L.Ed.2d 491 (1988).

### D. The Scope of the Business

If the work at issue is not a part of the hiring party's regular business, the hiring party is more likely to enlist the services of an independent contractor on a periodic basis (that is, when and if the need arises), rather than hire a full-time employee. In *CCNV,* for instance, the hiring party was a charity, and the hired party was an artist. 490 U.S. at 753, 109 S.Ct. at 2179. The Supreme Court found this suggestive of independent contractor status. *Id.; see also M.G.B. Homes, Inc. v. Ameron Homes, Inc.,* 903 F.2d 1486, 1492 (11th Cir.1990) (home builder using outside contractor for drafting work); *Respect Inc. v. Committee on the Status of Women,* 815 F.Supp. 1112, 1118 (N.D.Ill. 1993) (organization established to fund author's texts). Although the district court does not emphasize this factor, Hi–Tech relies heavily on it in its appellate brief.

Hi–Tech is in the business of producing videos. Accordingly, it would be perfectly understandable for Hi–Tech to maintain employees skilled in the various aspects of video production. Nevertheless, similarity between the hiring party's regular business and the hired party's work does not necessarily weigh significantly in favor of finding an employer-employee relationship. In *Marco v. Accent Publishing Co.,* 969 F.2d 1547 (3d Cir.1992), Accent, a publisher of a trade journal, regularly published photographs of its own conception. The Third Circuit noted, however, that a hiring party in Accent's situation "might easily accomplish its regular

business by using independent contractors rather than employees" to produce the required photographs. *Id.* at 1551. Accordingly, the regular business factor did not undermine the court's conclusion that the plaintiff photographer was an independent contractor. *See also M.G.B. Homes,* 903 F.2d at 1492; *Johannsen v. Brown,* 797 F.Supp. 835, 840–41 (D. Or.1992) (finding artist who produced cover artwork for magazine to be independent contractor).

By Akey's own admission, Hi–Tech uses independent contractors to accomplish its regular business. Akey testified that he is the only full-time employee and then explained, "And when we have a particular job that comes out, then, yes, we do hire freelance people to get involved in that project." As in *Marco,* the fact that the assistants' work was part of Hi–Tech's regular business is not particularly probative evidence of employment status.

### E. The Remaining Factors

Of the remaining factors, several find little foundation in the record at all. The live photography was obviously completed on site at Mackinac Island. It is, however, unclear whether Mueller and Cook completed their work (such as developing the graphics and writing the script, respectively) in their own studios or at Hi–Tech. Similarly, the record does not indicate the extent of Hi–Tech's discretion over when and how long to work.

Akey testified that Mueller worked on the Mackinac video for five days. The duration of Cline's and Cook's assistance on the Mackinac video is unknown. Furthermore, any assistance Cline, Mueller, and Cook rendered on earlier projects would be relevant to, though not dispositive of, employment status. This information is also unknown.

The district court found, however, that two of the remaining factors weigh in favor of finding an employer-employee relationship: (1) the fact that Akey's assistants did not have a role in hiring and paying additional assistants and (2) the fact that Hi–Tech is in

---

3. This case preceded *CCNV* but adopted and applied the agency principles test that the Supreme Court later approved in *CCNV. Compare Easter*

*Seal,* 815 F.2d at 335 *with CCNV,* 490 U.S. at 741–43, 109 S.Ct. at 2166–74.

business. Neither of these considerations is significant in the context of this case. The fact that Akey's assistants did not hire their own assistants is not surprising. In light of the scope of the project and the nature of the work, it is appropriate that Akey's assistants would work without assistants of their own. *Aymes v. Bonelli*, 980 F.2d 857, 861 (2d Cir.1992) ("[T]he factors relating to the authority to hire assistants will not normally be relevant if the very nature of the work requires the hired party to work alone."). Indeed, it would seem that a hired party's failure to hire her own assistants is rarely, if ever, significant in determining whether a party is an independent contractor. On the other hand, however, the *exercise* of authority to hire assistants tends to show independent contractor status. *Id.* (commenting on significance of authority to hire assistants). Thus, we accord no weight to this factor.

As discussed above, the fact that Hi–Tech is in business does not make it more likely that it would hire employees, because Hi–Tech could effectively accomplish its regular work through independent contractors instead of employees. *See Marco*, 969 F.2d at 1551. Contrary to the district court, then, this factor does not approach proof of the actual employment status of Mueller, Cline, and Cook. Therefore, we decline to give weight to this factor either.

### IV.

In sum, Akey's right to control and actual control of the video's production suggests, at first blush, that his assistants were employees. However, neither the right to control nor actual control alone can turn an otherwise independent contractor into an employee. *Easter Seal*, 815 F.2d at 336. The economic treatment of the assistants, the skill required of the assistants, and Akey's own perceptions of the assistants' status compel the conclusion that Cline, Mueller, and Cook were independent contractors. *See Banc-Training Video Sys. v. First Am. Corp.*, No. 91–5340, 1992 WL 42345 (6th Cir. Mar. 3, 1992).

Because the video was produced in part by independent contractors, Hi–Tech's Mackinac video is not a "work made for hire," and the copyright in the video as a "work made for hire" is invalid. Therefore, we **REVERSE** and **REMAND** the case with instruction to enter judgment in ABC's favor.

NATHANIEL R. JONES, Circuit Judge, dissenting.

I disagree with the majority's conclusion that Akey's production assistants were not "employees." Contrary to the majority, I believe the factors set forth in *Community for Creative Non–Violence v. Reid*, 490 U.S. 730, 750–51, 109 S.Ct. 2166, 2178–79, 104 L.Ed.2d 811 (1989) (hereinafter *CCNV*), for determining employee status weigh in favor of finding that the production assistants were indeed employees.

The issue turns on 17 U.S.C. § 101, which was authoritatively interpreted in *CCNV*, where the Supreme Court unanimously held that an association could not copyright a work created by a particular sculptor because the sculptor was an independent contractor, rather than an employee, of the association. *CCNV*, 490 U.S. at 751–53, 109 S.Ct. at 2179–80. Section 101 provides that a work is made "for hire," and accordingly copyrightable by the employer, under two sets of circumstances:

> (1) a work [is] prepared by an employee within the scope of his or her employment; or
>
> (2) a work [is] specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.

17 U.S.C. § 101 (1988).

Thus, under subsection (1) Hi–Tech may copyright the works of its *employees* without any restrictions, but under subsection (2) it may only copyright the works of *independent contractors* if it obtained written permission. Because no such agreement was signed here, the question turns on whether "employees"

made the video. *CCNV* provides the following guidance in this regard:

> To determine whether a work is for hire under the Act, a court first should ascertain, using general principles of general common law of agency, whether the work was prepared by an employee or an independent contractor.
>
> ... In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party. No one of these factors is determinative.

490 U.S. at 751–52, 109 S.Ct. at 2178–79 (footnotes and citations omitted).

It is undisputed that Akey was clearly an employee of Hi–Tech.[1] He hired others to do some of the camera work. He, himself, however, shot the scene of the island from an aircraft, which was used on "Good Morning America", and he, himself, edited and composed the film from the footage that others shot. He also designed the packaging of the work. Thus, he was an employee who "prepared" the work under § 101(1). I believe that this is, in itself, enough to establish that Hi–Tech could copyright the work as the "work for hire" of an employee.

Akey did delegate some of the creative work to others. Mike Mueller, whom Akey referred to as a non-employee, shot most of the film. J.A. at 113–14. Akey, however,

maintained control over the work. Akey was obviously skilled and experienced at video production work. *See, e.g.,* J.A. at 96 (Akey discussing technicalities of splicing film shots to make a "fade out" transition in film). This seems quite different from the situation in *CCNV,* where non-artists in an anti-homelessness agency hired a sculptor to create a sculpture. The *CCNV* factors that support a work for hire in the instant case include: (1) the hiring party's right to control the manner and means by which the product is accomplished (Akey maintained full control over the final product—what shots would be included, what order, the transitions, etc.); (2) the source of the instrumentalities (Akey supplied the cameras and other equipment); (3) the hired party's role in hiring and paying assistants (Akey completely controlled all aspects of hiring and paying assistants); (4) whether the work is part of the regular business of the hiring party (making videos was Akey's business, unlike the association in *CCNV*); and (5) whether the hiring party is in business (same).

Finally, I note that the district court found that "the vast majority of the creativity that was encompassed in this work was the work that Mr. Akey did by putting it all together, sequencing it, and packaging it as it was done." J.A. at 179. This is a finding of fact that should not be disturbed, and lends support to the conclusion that the video was a product of Akey, as a Hi–Tech employee. Moreover, the cases from other circuits applying *CCNV* are not especially relevant here, as each includes different circumstances than those now at issue. Therefore, I would affirm the district court's determination that this was a work for hire.

I respectfully dissent.

---

1. Akey was the only "employee," in the usual sense; other people were hired to do specific things.