ALCATEL USA, INC., Plaintiff,

v.

CISCO SYSTEMS, INC., Defendant.

Civil Action No. 4:00CV199.

United States District Court,
E.D. Texas,
Sherman Division.

Dec. 17, 2002.

Harry M Reasoner, Scott J Atlas, Kenneth P Held, Vinson & Elkins, Houston, TX, Stuart J Sinder, Alan H Pollack, Kenyon & Kenyon, New York City, Ronald S Rauchberg, Proskauer Rose Goetz & Mendelsohn, L.L.P., New York City, Clyde Moody Siebman, Siebman Reynolds & Burg LLP, Sherman, TX, Grayson, John C Stellabotte, Mark Davidson, Kenneth Rubenstein, Scott Shorr, Karen D Coombs, Scott A Eggers, Proskauer Rose, LLP, New York City, Thomas M Melsheimer, Matthew E Yarbrough, Michael Brett Johnson, Neil J McNabnay, Fish & Richardson PC, Dallas, TX, Alec W Farr, Proskauer Rose LLP, Washington, DC, Charles Guttman, Nolan M Goldberg, Proskauer Rose LLP, New York City, Ruffin B Cordell, Fish & Richardson PC, Washington, DC, for plaintiff.

Roger D Sanders, Sanders O'Hanlon & Motley, Sherman, TX, Barry C Barnett, Susman Godfrey LLP, Dallas, TX, Dallas, Franklin Brockway Gowdy, Gregory L Lippetz, Renee T Lawson, Elizabeth R Weiss, Brobeck Phleger Harrison, San Francisco, CA, for defendant.

Fred Irvin Williams, Brobeck, Phlegar & Harrison, Austin, TX, for Sevin Rosen Funds.

James Corley Henderson, Wolfe, Tidwell & McCoy, Sherman, TX, for Lucent Technologies Inc.

Jill Hubbard Bowman, Wilson, Sonsini, Goodrich & Rosati, Austin, TX, James A. DiBoise, Elizabeth M. Saunders, Wilson, Sonsini, Goodrich & Rosati, Palo Alto, CA, for Chiaro Networks Ltd.

## MEMORANDUM OPINION AND ORDER ON CISCO SYSTEMS, INC.'S RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT ON ALCATEL U.S.A., INC.'S COPYRIGHT CLAIM AND RELATED TRADE SECRETS (DOC. NO. 655).

PAUL N. BROWN, Senior District Judge.

Pending before the Court is Defendant Cisco Systems, Inc.'s ["Cisco"] Renewed

Motion for Partial Summary Judgment. Having considered the Motion, Plaintiff Alcatel USA, Inc.'s ["Alcatel"] Response, Defendant's Reply, Plaintiff's Sur–Reply, Defendant's Supplemental Reply, and Plaintiff's Supplemental Sur–Reply, as well as all of the summary judgment evidence and arguments of counsel, the Court is of the opinion that Defendant's Motion should be granted.

## BACKGROUND

In the present Motion for Summary Judgment, which primarily concerns Alcatel's claim against Cisco for copyright infringement of various computer programs, the Court is once again faced with examining the employment relationship between Marian Trnkus ["Trnkus"] and Alcatel. In October of 2000, approximately four months after this case was filed in this Court, Cisco moved for summary judgment against Alcatel's claim for copyright infringement on the grounds that Trnkus, the author of the Whip, WhipSource and "make" file programs, was an independent contractor rather than an Alcatel employee when he created the relevant computer programs in mid–1995. As a result, Cisco contended that ownership of the copyrights in those programs could not vest in Alcatel pursuant to the work made for hire doctrine, and consequently, Alcatel's copyright infringement claim should fail as a matter of law. In October of 2001, the Court conducted an in-depth examination and analysis into all of the arguments advanced by both Alcatel and Cisco with respect to the factors and evidence probative of Trnkus's employment status. Finding genuine issues of material fact emerged from the early summary judgment record, the Court denied Cisco's motion for summary judgment. [Doc. No.

369]. It was the Court's opinion that, based in part on the evidence obtained from the incomplete discovery, Trnkus's employment status ought not be prematurely characterized as a matter of law and that Alcatel should be afforded the opportunity to completely develop the facts in support of its allegations. Now, following the close of fact discovery, Cisco's current and renewed motion for summary judgment seeks to resurrect its previous contention that Trnkus was an independent contractor as a matter of law. In support of its contention, Cisco maintains that the recent discovery which it has been vigorously conducting since the summer of 2001 demonstrates as a matter of law that Trnkus was not an Alcatel employee. Accordingly, Cisco once again contends that Alcatel cannot establish ownership of the subject copyrights, rendering this claim appropriate for summary disposition.

In addition to Alcatel's claim for copyright infringement, Cisco moves for summary judgment against all of Alcatel's additional claims that relate to the copyrighted subject matter, which include Common Law Misappropriation, Trade Secret Misappropriation, Violation of the Texas Theft Liability Act, and Conversion.[1] According to Cisco, because the evidence establishes as a matter of law that Trnkus, not Alcatel, was the owner of the copyrights to the software programs at issue, Trnkus possessed a right of publication that precludes Alcatel from proving secrecy or improper disclosure or use of those programs. Finally, Cisco moves for summary judgment against Alcatel's claim regarding its alleged cross-connection management trade secret ("trade secret number 9"). Cisco contends that the evidence establishes as a matter of law that Alcatel does not own

---

1. Alcatel's claim against Cisco for conversion of trade secrets was dismissed on summary judgment pursuant to this Court's August 13, 2002 Order. [Doc. No. 903].

the underlying technology comprising trade secret number 9 because this trade secret is based upon technology that Trnkus created while working at Earth Information Systems. Additionally, Cisco contends that, even if Alcatel could establish ownership, Alcatel cannot establish that Cisco used this trade secret, and thus, it is entitled to summary judgment.[2] To aid the Court's resolution of the foregoing issues, the Court heard oral arguments on Defendant's present motion for summary judgment on October 17, 2002.

In its previous memorandum opinion and order denying Cisco's motion for summary judgment, the Court set forth the relevant factual background as follows:

Marian Trnkus has worked for many years as a computer programmer and software engineer. In fact, throughout his career, Trnkus has been employed at Alcatel, both as an employee and contractor, as well as Monterey Networks, Inc. ("Monterey"), Cisco's predecessor-in-interest. Specifically, in 1989, Trnkus began work at Rockwell International, which was subsequently acquired by Alcatel in 1990. Following Trnkus's full-time, two-year employment with Rockwell / Alcatel, he left Texas to work for an Alcatel affiliate in Germany. Shortly thereafter, Trnkus worked in 1993 as a contractor at Ericsson for approximately six months. Following his contract work for Ericsson, Trnkus resumed work at Alcatel in the Dallas area in

1994, this time, however, as a contractor assigned to work on Alcatel's cross-connect project. As fairly common in large technological markets, Alcatel had a policy permitting the acquisition of workers on a contract basis through certain authorized contractors, one of which was Prism. Thus, beginning in January of 1994, through Prism, Trnkus worked for Alcatel on a contract basis until 1998, conducting primarily software engineering.

The precise nature of Trnkus's relationship with and employment conditions at Alcatel are directly at issue and will be discussed more thoroughly below. However, suffice it to say Alcatel retained Trnkus for his known level of skill and paid Trnkus for his services indirectly through Prism; which is to say that Alcatel paid Prism, who in turn, paid Trnkus. In addition, Alcatel did not provide Trnkus with employee benefits such as a retirement package or health insurance, nor did Alcatel treat Trnkus as an employee for tax purposes. Plaintiff claims, however, that all other characteristics of Trnkus's relationship with Alcatel closely resemble a conventional employment relationship. Whatever the case, Trnkus continued to work at Alcatel as a contractor until July of 1998. This four and one half year duration, however, was segregated into a series of approximately six to nine-month contracts

---

2. Cisco has filed objections to evidence submitted in support of Alcatel's Response to Cisco's Renewed Motion. [Doc. No. 790]. Cisco objects to Alcatel's offering of various evidence primarily on the grounds that such evidence lacks foundation, is hearsay and/or is improper lay opinion. Much of the evidence to which Cisco objects was not relied on by the Court in deciding the present motion. Even so, the Court finds many of Cisco's objections to be untimely inasmuch as some of the evidence to which Cisco now

objects was previously relied on by Alcatel, without Cisco's prior objections, in defending Cisco's first motion for summary judgment on the copyright ownership issue. All such objections have been waived by Cisco. With respect to the remainder of Cisco's objections, the Court has carefully considered all of them along with Alcatel's Responses thereto. In so doing, the Court finds that, unless otherwise indicated in this Order, Cisco's objections should be overruled.

and extensions. In fact, the evidence suggests that neither Alcatel nor Trnkus knew whether their work relationship would extend past each current contract. Instead, as Alcatel's needs were assessed near each contract's expiration, Alcatel would extend or renew Trnkus's work contract accordingly. For example, Trnkus's initial contract with Alcatel in January of 1994 called for him to work on a specific feature for one of the cross-connect products (the 1631SX R4A release), and was to last until approximately October of 1994. However, in January of 1995, Alcatel submitted a requisition for the extension of Trnkus's services. The requisition memorandum authored by Trnkus's supervisor, Mr. Church, stated the renewal contract would be the last extension of Trnkus's contract. Pursuant to this contract, Alcatel engaged Trnkus's services for work on the cross-connect and 1633SX R9 development, which was to entail object-oriented design, which evidently was an area with which Trnkus had prior experience. Church has stated that his intent was to "assign Mr. Trnkus to take one of [Alcatel's] existing subsystems and convert it to accomplish the same functions using object oriented design. [Alcatel] gave this assignment to Mr. Trnkus and asked him to convert a subsystem known as PMPOLL to object oriented design." During this second nine-month contract, Trnkus authored several generic software programs to apparently assist him in his work performance at Alcatel. These programs, Whip, WhipSource and various "make" files [hereinafter collectively referred to as "the programs,"] form the basis of Plaintiff's claim for copyright infringe-ment. Essentially, the programs are software tools used to develop and maintain software source code, and the "make" files are an automated method for translating human readable source code into a finished working program. After developing the programs, Trnkus deposited them into Alcatel's program repository for subsequent use by Alcatel, and sometime in 1997, Alcatel decided to adopt Whip and Whipsource for its development program for the Optical Gateway Cross–Connect (OGX cross-connect).[3] During the developmental phase, Trnkus was requested to change the Whip tool to add an additional function to it that other software developers at Alcatel recognized would assist the Alcatel team in . developing and maintaining code on this new project. Pursuant to Alcatel's request, Trnkus apparently made the appropriate modifications at Alcatel.

In 1998, Trnkus left Alcatel and began work at Monterey, Cisco's predecessor. While at Monterey, Trnkus allegedly began using the programs he created while at Alcatel and that were deposited in Alcatel's program repository. He named the programs "Genapt" and "Deppat." In addition, others at Monterrey were evidently persuaded into using the programs. The underlying copyright dispute is thus created by the fact that Alcatel claims ownership of all right, title and interest in and to the copyrights in the computer programs "Whip," "Whipsource," and "Makedep,"("make"file) and that, because Defendant used these programs (or substantial similarities thereof), it infringed on Alcatel's copyrights.

*Alcatel USA, Inc. v. Cisco Systems, Inc.,* 4:00cv199, at 2–5 (E.D.Tex. October 30,

**3.** Prior to initiating its suit in this Court, Alcatel submitted copyright registrations in May of 2000 asserting ownership to the relevant programs as works made for hire.

2001) (order denying motion for summary judgment) (footnotes omitted).

### SUMMARY JUDGMENT STANDARD

The granting of summary judgment is proper if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). The trial court must resolve all reasonable doubts in favor of the party opposing the motion. *Casey Enters. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir.1981) (citations omitted). The party seeking summary judgment carries the burden of demonstrating that there is no actual dispute as to any material fact in the case. This burden, however, does not require the moving party to produce evidence showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The moving party satisfies its burden by "pointing out to the district court ... that there is an absence of evidence to support the nonmoving party's case." *Id.*

Federal Rule of Civil Procedure 56 does not impose a duty on a district court to "sift through the record in search of evidence to support a party's opposition to summary judgment." *Doddy v. Oxy USA, Inc.*, 101 F.3d 448, 463 (5th Cir.1996) (citations omitted). Once the moving party has satisfied its burden, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e). Such nonmovant must also articulate the precise manner in which evidence he sets forth supports his claims. *See Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir.1994) (citation omitted). Moreover, in designating specific facts, the nonmovant must " 'go beyond the pleadings' " and use " 'his own affidavits, ... deposition[s], answers to interrogatories, and admissions on file.' " *Jones v. Sheehan, Young & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir. 1996) (citation omitted).[4]

If the nonmovant fails to set forth specific facts in support of allegations essential to that party's claim and on which that party will bear the burden of proof, then summary judgment is appropriate. *Celotex*, 106 S.Ct. at 2552–53. Even if the nonmovant brings forth evidence in support of its allegations, summary judgment will be appropriate unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citations omitted).

### DISCUSSION

#### I. *The copyrighted programs created by Marian Trnkus were not works made for hire.*

To establish copyright infringement, a plaintiff must demonstrate it owns the copyrights to the relevant subject matter. *Alcatel USA, Inc. v. DGI Technologies, Inc.*, 166 F.3d 772, 790 (5th Cir.1999). Under the 1976 Copyright Act ("the Act"), ownership of a copyright "vests initially in the author or authors of the work." 17 U.S.C. § 201(a) (1996). As a general rule, the author of a work is "the person who translates an idea into a fixed, tangible expression entitled to copyright protec-

---

**4.** The Court also notes that Local Rule CV 56(b) states that a party's response to a summary judgment motion should "be supported by appropriate citations to proper summary judgment evidence...." Local Rule CV 56(c) further states that the Court will not "scour the record in an attempt to determine whether the record contains an undesignated genuine issue of material fact for trial before entering summary judgment."

tion." *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 109 S.Ct. 2166, 2171, 104 L.Ed.2d 811 (1989). The work made for hire doctrine, however, carves out an important exception. 17 U.S.C. § 201(b). Under this doctrine, the general rule conferring copyright ownership to its author is qualified to provide that "the employer or other person for whom the work was prepared is considered the author ... and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." *Id.* Under section 101 of the Act, a work made for hire can arise under two circumstances "(1) a work prepared by an employee within the scope of his or her employment; or (2) a work specially ordered or commissioned ... if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." *Id.* at § 101.[5]

Although the Act does not define the term "employee," the United States Supreme Court has set forth a non-exhaustive, thirteen-factor test for determining whether an author is an employee within the meaning of the Copyright Act's work made for hire provision. *Reid,* 109 S.Ct. at 2178–79. In its decision, the Court inferred that the congressional intent in its use of the term and phrase "employee" and "work made for hire" was to apply conventional principles of the master-servant relationship. *Id.* at 2172. In so doing, the Court essentially adopted the Fifth Circuit's reliance on general principles of common law agency to assist in the factfinder's determination. *Id.* at 2178–79; *Easter Seal Soc'y v. Playboy Enters.,* 815 F.2d 323 (5th Cir.1987).

In determining whether a hired party is an employee under the general common law of agency, we consider (1) the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are (2) the skill required; (3) the source of the instrumentalities and tools; (4) the location of the work; (5) the duration of the relationship between the parties; (6) whether the hiring party has the right to assign additional projects to the hired party; (7) the extent of the hired party's discretion over when and how long to work; (8) the method of payment; (9) the hired party's role in hiring and paying assistants; (10) whether the work is part of the regular business of the hiring party; (11) whether the hiring party is in business; (12) the provision of employee benefits; and (13) the tax treatment of the hired party.

*Reid,* 109 S.Ct. at 2178–79 (footnotes omitted). In its decision, the Court noted that no single factor is determinative. *Id.* Finally, "whether a given individual is an employee or independent contractor is a question of law, which must be decided by reviewing the particular facts of each case." *Kirk v. Harter,* 188 F.3d 1005, 1007 (8th Cir.1999) (quoting *Berger Transfer & Storage v. Central States,* 85 F.3d 1374, 1377 (8th Cir.1996)) (citations omitted).

In its previous memorandum, opinion and order denying Cisco's motion for summary judgment on the ownership element of Alcatel's copyright claim, the Court ruled that Trnkus's true employment status was equivocal in light of the summary judgment evidence then available to the Court. It was the Court's opinion that some of the *Reid* factors remained unclear and that, because fact discovery was still on-going, a rational jury could ultimately conclude that Trnkus was in substance an

---

**5.** Section 101 of the Act lists and defines each of the nine categories of "specially ordered or commissioned" works; none of which, however, are applicable in this case.

Alcatel employee. Accordingly, summary judgment was not appropriate on this issue. In opposing Cisco's renewed motion for summary judgment, Alcatel argues that this Court's prior determination that issues of fact then existed as to Trnkus's employment status necessarily compels this Court to once again reach the same conclusion.[6] The Court does not agree.

The prior summary judgment record on which this Court relied in denying summary judgment one year ago was based almost exclusively on the facts and occurrences as then developed in the prior state-court litigation. That record, while certainly relevant, failed to capture the totality of evidence probative of Trnkus's employment status. Since the completion of parties' briefing on Cisco's original motion for summary judgment in November of 2000, both parties have been engaged in substantial and contentious discovery from which additional evidence emerges. The factors relevant to Trnkus's employment status, which were previously obscured by the incomplete discovery, have now been brought into sharper focus due to the passage of time and development of the record. When this complete record is carefully considered, the Court concludes that no genuine issues of fact exist which are material to the resolution of Trnkus's employment status at Alcatel. Instead, the evidence, even when viewed in the light most favorable to Alcatel, is insufficient to permit a jury to conclude that Trnkus was an Alcatel employee at the time he created the relevant programs in 1995.

Previously, the Court found that "the precise level of control Alcatel possessed over Trnkus's creation of the programs at issue [was] unclear." Based on the early summary judgment record, it appeared that Marian Trnkus was intimately involved with a team of other highly-skilled software engineers who were all controlled in the details of their work by Alcatel management. Consequently, the Court was of the opinion that a development of the summary judgment record could potentially yield evidence and a conclusion that Alcatel's right of control over Trnkus's developmental work was wholly inconsistent with an independent contracting relationship. An examination of the evidence relating to this factor now indicates that, although Alcatel may have controlled certain aspects of Trnkus's work; little, if any, evidence exists to indicate Alcatel had a right to control the actual manner and means by which Trnkus created the copyrighted programs at issue. Furthermore, to the extent Alcatel enjoyed such right, this treatment and supervision of Trnkus was not inconsistent with Alcatel's treatment of other independent contractors.

---

**6.** Related to the determination of Trnkus's employment status, Alcatel has filed a motion to strike evidence submitted in support of Cisco's Renewed Motion for Summary Judgment. [Doc. No. 740]. In that motion, Alcatel seeks, among other things, to strike various excerpts of the Declarations of Mark Lanning and Whitney Smith, which according to Alcatel, improperly opine on the ultimate legal issue of Trnkus's employment status. Alcatel's motion should be granted in part and denied in part. The ultimate determination of one's employment status is indeed a question of law. *See Langman Fabrics v. Graff Californiawear, Inc.,* 160 F.3d 106, 111 (2d Cir.1998). However, that ultimate determination must be based on settled facts. *Id.* Therefore, while the Court will disregard any conclusory statements offered by Lanning or Smith, or any witness for that matter, which purport to opine on the ultimate legal conclusion of Trnkus's employment status, the Court may consider a declarant's statements that relate to unsettled facts relevant to the underlying *Reid* factors. Finally, the Court did not consider Trnkus's allegations of attorney misconduct in deciding this motion. As to the remainder of Alcatel's motion, the Court will overrule such objections.

The first declaration of Ronald Church, to which this Court previously gave the benefit of the doubt, contains statements by Church, who was one of Trnkus's supervisors, that Trnkus was treated no differently than permanent Alcatel software engineers, that Trnkus did not work independently, that Alcatel had the same right to control the manner and means by which Mr. Trnkus performed his development work as it did for other software engineers, and that Alcatel had the rights to assign Trnkus to different projects and to use different programming languages. Aside from being vague as to the time period to which they relate, Church's statements are mostly conclusory and are substantially undermined by the recent submission of his second declaration. In his second declaration, Church stated, among other things, that his prior statement that Alcatel had the right to control Trnkus's "means and methods of the performance of his work was based only on my assumption that the agreement between Alcatel and Prism ... gave Alcatel that right," and that, Church's previous declaration "should not be construed to suggest that Mr. Trnkus was an Alcatel employee or treated in a manner that would characterize him as an Alcatel employee, which he certainly was not." Church continues by stating that "Alcatel's treatment of Mr. Trnkus was consistent with its treatment of all other independent contractors."

Nevertheless, shortly after he submitted his second declaration, Church submitted declaration number three to once again support Alcatel's position that Trnkus was its employee. In this declaration, which was executed approximately two months after his second, Church urges that no statements contained in his second declaration on which Cisco relies should be construed to retract from anything that he stated in his first declaration. Further-more, Church's third declaration states that "Alcatel had the right to control the manner and means by which Mr. Trnkus performed his development work as it did the work of any other Alcatel software engineer [and that] as a practical matter ... Alcatel did not treat Mr. Trnkus any differently than any other software engineer." Thus, to the extent that Church revoked his first declaration by executing his second, he seeks to revive his first declaration by executing his third.

As a pawn, Church is clearly being deployed to advance the respective positions of two bitterly contentious parties to this action, and thus the Court is paused to afford any weight to Church's seemingly inconsistent positions that are based on mostly conclusory statements and opinions. Even so, most of Church's statements on which Alcatel relies in support of its position infer that the level of control that Alcatel maintained over Trnkus, if any, related not to the manner and means by which Trnkus created the specific copyrighted programs at issue, but to the general manner and means by which Trnkus performed his development work and general duties in relation to his work on the 1633 SX. Furthermore, other evidence on which Alcatel relies is not particularly compelling. For instance, Michael Laughman's deposition testimony does not, as Alcatel contends, create genuine issues of fact necessitating a trial. Mr. Laughman, who became Trnkus's supervisor in early 1995, testified by deposition that, among other things, Alcatel had the right to control the manner and means of Trnkus's work, that Alcatel enjoyed the right to tell Trnkus to perform work in a particular way, and to have Trnkus change designs for projects. However, aside from being vague and conclusory, these statements similarly fail to demonstrate that Alcatel had a right to control the specific creation

of the copyrighted programs themselves. The precise nature of Trnkus's work at Alcatel illuminates this issue.

In early to mid–1995, during which the relevant programs were created, Trnkus performed developmental work on the 1633 SX cross-connect. In this capacity, Trnkus was engaged in a relatively independent and experimental assignment of updating the performance monitoring ("PM") subsystem, specifically the PMPOLL, using object-oriented design. The relative independence of Trnkus's developmental work at Alcatel is underscored by Paul Baniewicz's deposition testimony elicited in December of 1999. There, Mr. Baniewicz, who was employed at Alcatel and essentially responsible for software planning and development for the OGX in 1995, testified that:

> [Trnkus] really worked on an hourly basis. [Alcatel] gave him a very flexible schedule because we didn't have a lot of people who were highly dependent on him, so he did do work at home or he would take a couple of days off but we paid him for what he did. And sometimes he would work extra hours during one week and take days off the following. So we asked him to charge us for the work he did.

Furthermore, Mr. Trnkus testified by deposition in November of 2001 that, except for a "high-level objective," nobody was supervising his work in 1995 when he was working on the PMPOLL subsystem for the 1633 SX and that nobody at Alcatel was working with C++ programming language in relation to the PMPOLL because "there was not a single person at Alcatel who could understand C++." Trnkus further stated that Mr. Church did not assign or manage specific details of his PM sub-system work. As to the relevant copyrighted programs, Trnkus created them at home, on his own time, and on his own Sun Workstation that was purchased in March of 1995 by Guadalupe Software. Furthermore, although the creation of the tools at issue may have facilitated the performance of Trnkus's subsystem conversion or development, nobody at Alcatel evidently asked Trnkus to create the specific copyrighted programs.

As Trnkus's November 2001 deposition testimony reflects, Mr. Trnkus, who was simultaneously working as an independent contractor for two other companies, wrote the Whip programs in 1995 as a generic tool to assist him with his work in doing things he had to do "over and over again." More specifically, Trnkus testified that he created Whip, WhipSource and the make-files:

> as a utility to help me—basically help my laziness of doing dull work that is not inventive. Whip and WhipSource replace your copy-and-paste operation, which, for me, is not in[v]entive. So I created [a] tool that does it for me. It takes one file and replaces some strings inside that file and turns it into another file.

Furthermore, that Trnkus's creation of the programs at issue was not a part of Alcatel's assignment is bolstered by Trnkus's testimony elicited during the hearing on application for injunctive relief held on December 14, 1999. There, Trnkus testified that nobody at Alcatel assigned to Trnkus the task of developing tools such as Whip. Instead, Trnkus testified that he "developed Whip as a generic utility to help [him] write code, period. It wasn't for [the] OGX. It was ... just for me."[7] In

---

7. Additionally, when the Honorable Margaret Keliher inquired into the programs at issue during the hearing on the application for in- junctive relief, Trnkus responded that the creation of the makefiles was something above and beyond that which was required by Alca-

sum, while Alcatel may have adduced some evidence suggesting it enjoyed a right to oversee or control the high level objective of Trnkus's tasks as to the 1633 SX development, it has not demonstrated that Trnkus's creation of the relevant programs and tools, of which Alcatel now seeks ownership, was subject to Alcatel's right of control whatsoever.[8]

Even if Alcatel maintained the right to control Trnkus's development of the copyrighted programs at issue, as Alcatel unpersuasively insists, this factor is neither sufficient to convert Trnkus into an Alcatel employee nor is it necessarily inconsistent with independent contractor status. *See Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 109 S.Ct. 2166, 2179, 104 L.Ed.2d 811 (1989) (stating that the "extent of control the hiring party exercises over the details of the product is not dispositive."); *Quintanilla v. Texas Television, Inc.,* 3 F.Supp.2d 747 (S.D.Tex.1997) (stating that, "even if the Court were to find that Quintanilla exerted some control over the creation of the . . . Videotape, this showing alone is insufficient to establish the existence of an employer/employee relationship."); *Hi–Tech Video Prod., Inc. v. Capital Cities/ABC, Inc.,* 58 F.3d 1093, 1099 (6th Cir.1995) (stating that "neither the right to control nor actual control alone can turn an otherwise independent contractor into an employee.") (citation omitted). Arguably, a hiring party's right to control and monitor the performance of an independent contractor, at least on some level, is necessarily and justifiably present in nearly all such relationships.

This factor alone, therefore, should not convert a hired party into an employee.

In its previous order denying Cisco's motion for summary judgment, the Court ruled that the evidence was inconclusive as to whether Alcatel had the right to assign to Trnkus additional projects. This issue remains slightly ambiguous. On the one hand, it appears that Alcatel had no such right to assign Trnkus additional projects. Tim Church's memorandum addressed to Alcatel's CEO on January 4, 1995 indicated that Trnkus's contract would be extended to September 30, 1995 for the purpose of working on the 1633 SX R9 development. No agreements evidently existed between Alcatel and Trnkus or Prism which gave rise to a right for Alcatel to unilaterally assign additional projects to Trnkus beyond the 1633 for which Trnkus's term was apparently renewed. On the other hand, however, Mr. Laughman's deposition testimony indicated that, at least on some level, Alcatel had a right to assign various projects to Trnkus. For example, Laughman testified that he had the "right to change the tasks assigned to Mr. Trnkus," that he gave Trnkus "new assignments as a member of [his] team," and that he believed he had the right "to tell Mr. Trnkus what work he would be doing." Viewed in the light most favorable to Alcatel, issues of fact arguably exist as to whether Alcatel had a right to assign to Trnkus additional projects.

Nevertheless, the conceivable presence of this fact issue is not necessarily material to the ultimate resolution of Trnkus's employment status. First, the Court agrees

tel. Trnkus stated that the makefiles, which were used as a sort of copy-and-paste operation, were created as part of his own personal environment and that Alcatel already had its own makefiles. The makefiles already in existence, however, were not to Trnkus's liking, so he created his own. According to Trnkus, "that's how these tools came about."

**8.** Even if Alcatel had the right to control Trnkus's creation of the copyrighted programs, this right was consistent with the right Alcatel contractually maintained over many other workers that Alcatel hired and expressly characterized as independent contractors.

with Cisco's contention that the relevance of the right to assign factor is somewhat diminished by the factual context surrounding the present case. In examining the right to assign factor, courts should not consider whether the hiring party has a general right to assign to the hired party various projects that relate to the completion of the assigned task, but whether the hiring party has the right to assign projects in addition to the project of creating the copyrighted works themselves. *See generally Hi–Tech Video Productions, Inc. v. Capital Cities/ABC, Inc.,* 58 F.3d 1093, 1096 (6th Cir.1995) (discussing that although the hiring party may have engaged some assistants in "other projects," there was no suggestion that the hired parties had to accept assignments unrelated to the travel video—the project for which they were retained). Indeed, present in nearly all independent contractor relationships is a hiring party's right to assign various tasks and projects that relate or are necessary to the completion of an underlying project. In the instant case, Trnkus was not assigned the specific project of creating the copyrighted tools at issue. Instead, he was assigned the developmental task of rewriting the PMPOLL function for the 1633 SX. Accordingly, that Alcatel may have enjoyed a vague right to assign projects related to his developmental assignment becomes substantially less relevant.

Second, the force and significance that Alcatel seeks to attach to its contentions that it maintained a right to assign to Trnkus additional projects, as well as control Trnkus's developmental work, is substantially undermined by Alcatel's treatment of other independent contractors who worked at Alcatel pursuant to various con-

sultant agreements. Cisco's supplemental reply brief, submitted to the Court on July 16, 2002, references Alcatel consultant agreements into which it entered with various independent contractors. Although these agreements concern contractors other than Prism Consultants and Mr. Trnkus for the performance of work not related to the development of the copyrighted programs at issue, the agreements do demonstrate that, to the extent Trnkus was subject to Alcatel's control and assignment of additional projects, these rights were consistent with the rights Alcatel maintained with other independent contractors who worked at Alcatel concurrently with Trnkus.[9]

For instance, the agreement into which Alcatel entered in 1993 with Ted Bensinger, who was expressly characterized as an independent contractor, was effective for a term of five years. Pursuant to this agreement, Alcatel maintained the right to, "at any time, ... issue additional instructions, require additional services, or direct the omission of services covered by this agreement." In addition, the agreement expressly defined the "scope of the work" to be conducted by the independent contractor as various specific duties and projects as well as "any other projects as assigned." The rights that Alcatel expressly maintained over its independent contractors pursuant to this and other agreements belie Alcatel's contention that Mr. Trnkus was treated in a manner that was somehow inconsistent with independent contractor status.

The Court has concluded that the evidence on which Alcatel relies in support of its contentions that Alcatel had a right to control the manner and means of Trnkus's developmental work and to assign to him

9. These relevant agreements also dispel the Court's prior concern that Trnkus's being a member of an Alcatel team and subject to regular review and critique were factors evidencing an employment relationship.

additional projects, when viewed against the plethora of evidence gravitating toward independent contractor status, is insufficient to permit a rational jury to conclude an employer/employee relationship existed. Unlike formal employees, Mr. Trnkus did not receive formal performance evaluations, was not paid overtime, and was not eligible for bonuses or promotions. Furthermore, Alcatel did not treat Trnkus as an employee for tax purposes; nor did Alcatel provide to Trnkus those benefits typically afforded to an employee, such as medical insurance or a retirement program. This factor is significant. When Alcatel decided to retain Trnkus's services through Prism Consultants in 1994, it chose to treat Trnkus as an independent contractor for tax and benefits purposes— a position taken obviously to Alcatel's advantage. When Alcatel filed its application for injunctive relief in state court five years later, it still maintained, through its counsel, that Trnkus was an independent contractor throughout the relevant time period.[10] Then, when it finally became advantageous for Alcatel to treat Trnkus as its employee in order for it to assert ownership of Trnkus's creations, Alcatel so declared on the copyright registrations submitted in May of 2000. Alcatel's current and disingenuous assertion that Marian Trnkus was its employee is completely antithetical to its prior consistent treatment of Trnkus.

Other characteristics of Trnkus's status at Alcatel are consistent with an independent contractor relationship. At the time Trnkus created the relevant computer programs, he was conducting services as an independent contractor for two other companies, Earth Information Systems and Sun Microsystems. While this factor does not compel a finding of independent contractor status, it certainly suggests Trnkus was not an Alcatel employee. *Kirk v. Harter*, 188 F.3d 1005, 1008 (8th Cir.1999). Furthermore, Patrick Vogeler, Alcatel's Senior Vice President for Human Resources, testified by deposition that the consequences of mis-classifying an employee as an independent contractor can result in significant exposure. To preserve the distinction between employees and independent contractors, Vogeler testified that, among other things, Alcatel ensured that independent contractors were not on its payroll, that independent contractors would receive a different colored badge, and that Alcatel would try to limit the amount of time independent contractors worked for them to six months. These factors were consistent with the method by which Trnkus was treated at Alcatel. Trnkus, for example, was not on Alcatel's payroll. Instead, he was paid indirectly by Alcatel through Prism Consultants.[11] Ad-

---

**10.** In Alcatel's Original Verified Petition and Application for Injunctive Relief and Affidavit of Michael Soulakis submitted in support thereof, both of which this Court takes Judicial Notice, Alcatel stated that Trnkus was working for Alcatel "as an independent contractor." Furthermore, Alcatel's designated corporate representative, Mr. Baniewicz, testified by deposition in December of 1999 that Trnkus was characterized as an independent contractor:

Q: (Mr. Barnett) Okay. At the time (he created Whip) he was an independent contractor from Alcatel's point of view, is that correct?

A. Yes. And we just term it contractor.

Q: Sure. But he wasn't an employee, correct? . . .

A: He was a contractor, yes.

**11.** Other characteristics of Trnkus method of payment are inconclusive. While Trnkus's payments were not contingent upon the completion of a particular job and Trnkus was paid bi-weekly like permanent Alcatel employees, these bi-weekly payments were issued against a lump-sum contract amount. For example, the "Alcatel / Prism Temporary Labor Personnel Order Form" entered on Janu-

ditionally, in contrast to permanent Alcatel employees, Trnkus was issued an orange badge identifying him as a consultant. Finally, Marian Trnkus, consistent with Alcatel's treatment of its independent contractors, was essentially limited to six-month contract terms with Alcatel. These factors, furthermore, are consistent with Alcatel's applicable corporate policies referenced by Cisco that prohibit the treatment of independent contractors as employees.

In its attempt to resist summary judgment, Alcatel contends, in part, that the long-term relationship between Alcatel and Trnkus militates against a finding of an independent contractor relationship. The Court does not necessarily agree. Trnkus's authorship of the relevant programs in mid–1995 occurred in the infancy of his work relationship with Alcatel, at which time it was evident that neither Alcatel nor Trnkus had reason to believe their contracting relationship would exceed nine months. In fact, Tim Church's January 4, 1995 memorandum to Mr. Prabhu regarding Trnkus's contract renewal stated that, pursuant to their agreement, this extension would be the last one for Trnkus and that any further extension of Mr. Trnkus's contract would be *as a permanent employee.* [emphasis added]. Accord-

ingly, that Alcatel and Trnkus's relationship ultimately proved to last beyond four years becomes substantially less relevant when considered within the context of the parties' understanding in 1995, the year the relevant programs were created.[12] Moreover, even if Alcatel could attach significance to the four-year relationship between Alcatel and Trnkus, at least one circuit, in reversing a trial court, has found the existence of an independent contractor status notwithstanding a six-year relationship between the two parties.[13] *Kirk,* 188 F.3d at 1008.

Having reviewed all of the relevant evidence, the Court is convinced that Trnkus was not in substance an Alcatel employee at the time the copyrighted programs were created. Since August of 1999, the parties have been engaged in discovery on the copyright ownership issue. The Court has carefully considered the complete record and all of the arguments advanced by counsel. In so doing, the Court finds that no genuine issues of material fact exist which should preclude summary judgment. Even assuming Alcatel has demonstrated factual issues as to whether Alcatel had the right to control Trnkus's developmental work and that Alcatel has the right to assign Trnkus additional projects, the ten-

---

ary 2, 1995, through which Trnkus's initial contract was extended, indicated a total funding amount of $97,500 for the nine-month extension.

**12.** Significantly, aside from the specific factors enumerated by the Supreme Court's decision in *Reid,* the Court, in determining one's employment status, refers to the Restatement of Agency for guidance. *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 109 S.Ct. 2166, 2179 n. 31, 104 L.Ed.2d 811 (1989). One of the factors relevant to one's employment status referenced in section 220(2)(i) of the Restatement is the parties' own perception of the relationship at issue. Accordingly, inasmuch as Alcatel's perception of Trnkus's relationship in 1995 is manifested

in the Church memorandum, which suggests Trnkus was not yet considered an Alcatel employee, this factor is indicative of an independent contracting relationship. *See* RESTATEMENT (SECOND) OF AGENCY § 220(2)(i) (1957); *see also Hi–Tech Video Productions, Inc. v. Capital Cities/ABC, Inc.,* 58 F.3d 1093, 1097–98 (6th Cir.1995) (stating that the perceptions of the parties should be considered and is "highly indicative" of the hired party's status).

**13.** In addition, as the aforementioned five-year consulting agreement between Alcatel and Ted Bensinger highlights, long-term relationships with independent contractors are not entirely novel with Alcatel.

uous evidence in support of these factors is insufficient, when considered against all of the relevant factors and evidence in this case, to permit a rational jury to find for Alcatel. Accordingly, because the Court finds Trnkus was an independent contractor at the time he created the copyrighted programs in 1995, the programs are not works for hire, and therefore, Alcatel's copyright registrations of the programs as works made for hire are invalid.

## II. *The Alcatel/Prism contract does not assign ownership of Trnkus's copyrights to Alcatel.*

Pursuant to Section 204(a) of the Copyright Act, "[a] transfer of copyright ownership ... is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's *duly authorized agent.*" 17 U.S.C. § 204(a) (emphasis added). Relying on this provision, Alcatel contends that, although there is no written assignment agreement between Alcatel and Trnkus, Alcatel should nevertheless be conferred ownership in the subject copyrights pursuant to the assignment clause contained in the agreement between Alcatel and Prism, which was previously in place at the time Trnkus was first hired through Prism. According to Alcatel, Prism, acting as Trnkus's agent, assigned to Alcatel all interest in any copyrights in any works that Trnkus created while he was working at Alcatel through Prism.

Relevant provisions and circumstances of the Prism agreement reveal the sophistry of Alcatel's assignment theory. Paragraph 13 of the Prism contract, for instance, contains an assignment clause which states in relevant part: "In the event that the copyright in any data and information generated in the performance of this agreement does not vest in [Alcatel] by operation of law, [Prism] hereby agrees to assign and assigns to [Alcatel] the copyright in all such data and information." However, paragraph 1 states that services sought "shall be performed only by C. Douglas Richardson on behalf of [Prism], an independent contractor, and not as an employee of [Alcatel]." The next paragraph states that the agreement "shall commence on October 4, 1993 and terminate on December 3, 1993, if not earlier terminated as provided herein." Furthermore, paragraph 5 provides that the "[p]erformance of this Agreement may not be subcontracted in whole or in part nor assigned without, in each case, the prior written consent of [Alcatel] and [Prism]." Finally, Richardson himself testified that he never signed a contract or addendum which described or identified Trnkus as being subject to the Prism agreement.

In light of these provisions and circumstances, the Court rejects Alcatel's circuitous approach at obtaining ownership of the relevant copyrights. The Prism agreement, to which Alcatel seeks to bind Trnkus, was executed approximately four months prior to the commencement of Richardson and Trnkus's relationship. In addition, aside from the fact that Trnkus neither signed nor apparently knew of the Prism agreement's terms, such agreement was to terminate on or before December 3, 1993, which was approximately one month prior to Trnkus's start at Alcatel. In recognition of this obstacle, Alcatel contends that the purchase orders, through which Trnkus arrived at Alcatel, served to modify or revive the expired Prism agreement. However, the purchase orders, including the first one dated January 5, 1994, makes no clear reference to the attempted revival of the Prism agreement. Moreover, the Prism agreement itself nowhere contemplates an amendment or revival by purchase order. Thus, it is the Court's opinion that, because the purchase

orders did not and could not serve to amend or revive the terminated Prism agreement, the express terms of such agreement must control; and because one of the Prism agreement's express terms provided for a December 3, 1993 termination date, the assignment clause contained therein should not serve to confer onto Alcatel ownership of the subject copyrights.

Even assuming, *arguendo,* that Alcatel had adequately shown that the terminated Prism agreement was revived by the subsequent purchase orders, Alcatel's success on its assignment theory would also require it to establish that (1) Alcatel and Prism properly modified the Prism contract to include the services of Mr. Trnkus; (2) Doug Richardson, serving as Trnkus's agent, bound Trnkus to the terms of the Prism agreement; (3) Trnkus effectively transferred his copyright interests to Prism; and (4) the Prism contract itself, being revived by subsequent purchase orders, transferred the subject copyrights to Alcatel.

In the Court's opinion, the evidence before it is insufficient to create an issue of fact with respect to Trnkus's alleged assignment of the relevant copyrights. The success of Alcatel's assignment theory hinges on a series of tenuous inferences and is simply untenable. The writing requirement mandated by section 204(a) serves to ensure that copyright ownership will not be given away inadvertently and forces parties who want to transfer copyright ownership to determine precisely what rights are being transferred and at what price. *See Quintanilla v. Texas Television, Inc.,* 3 F.Supp.2d 747, 752 n. 6 (S.D.Tex.1997) (citing *Effects Assocs., Inc. v. Cohen,* 908 F.2d 555, 557 (9th Cir.1990)); *Playboy Enters., Inc. v. Dumas,* 53 F.3d 549, 564 (2d Cir.1995) (noting that when a district court finds that the written agree-

ment is ambiguous, it may conclude that the writing is insufficient to create a transfer under § 204(a)). Sustaining Alcatel's assignment theory would frustrate Congress' paramount goal in revising the 1976 Act, which was to "enhanc[e] predictability and certainty of copyright ownership." *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 109 S.Ct. 2166, 2177, 104 L.Ed.2d 811 (1989) (citing H.R.Rep. No. 94–1476, p. 129 (1976), U.S.Code Cong. & Admin.News 1976, p. 5659). Accordingly, Cisco is entitled to summary judgment on this issue. Because the Court finds that the Alcatel/Prism agreement does not serve to assign ownership of the subject copyrights onto Alcatel, and because the Court previously ruled that the programs were not works for hire under section 201(b) of the Copyright Act, Marian Trnkus is the exclusive owner of the copyrighted programs.

### III. *Marian Trnkus's ownership of the copyrighted programs precludes Alcatel from maintaining its related state law claims based on the copyrighted subject matter.*

Having made this determination, the Court further finds that Mr. Trnkus's sole ownership of the copyrights to Whip, WhipSource and makefile programs precludes Alcatel's assertion of a related and pendent claim for misappropriation of the trade secrets that consist of those programs. Under section 106 of the Copyright Act, owners of copyrighted works enjoy the exclusive rights to disclose, license, publicize, or distribute the programs at issue. 17 U.S.C. § 106 (1996). These unfettered and exclusive rights of publication and disclosure of the copyrighted works prevent Alcatel from establishing the required element of secrecy necessary for it to maintain a claim for misappropriation of trade secrets. *See Avtec Systems,*

*Inc. v. Peiffer,* 21 F.3d 568, 575 (4th Cir. 1994).

> Avtec offers no authority, and we have found none, for the proposition that the alleged "owner" of a trade secret ... could maintain the secrecy of material that is subject under federal law to publication at the will of another. We do not believe that a nonexclusive use license in copyrighted material can support the reasonable expectation or right of secrecy necessary to predicate a claim that the identical material is a trade secret protectible under Virginia law.

*Id.* (citing RESTATEMENT (FIRST) OF TORTS § 757 cmt. b (1939)) (trade secrets must have "a substantial element of secrecy ... so that, except by the use of improper means, there would be difficulty in acquiring the information"; one factor in determining trade secrecy is the ease or difficulty with which the information could be properly acquired by others).

Therefore, that Alcatel could maintain a right of secrecy in the very programs to which Trnkus enjoyed an exclusive right of publication, is simply not supportable. Accordingly, summary judgment should be granted in favor of Cisco on those portions of Alcatel's claims for Common Law Misappropriation, Trade Secret Misappropriation and violation of the Texas Theft Liability Act that relate to the copyrighted subject matter.[14]

## CONCLUSION

For the foregoing reasons, Cisco's renewed motion for partial summary judgment against Alcatel's copyright and related trade secret claims should be granted. Because the Court by a separate and forthcoming order has granted Cisco's motion for summary judgment for lack of remedy, which is dispositive of all claims in this action, the Court does not reach the issue relating to Alcatel's alleged cross-connect management trade secret raised in Cisco's motion for partial summary judgment. All other relief not expressly granted herein is denied.

IT IS SO ORDERED.

---

**14.** Cisco's rather general allegations that Alcatel's misappropriation of trade secret claims should alternatively fail on the grounds that Alcatel has not demonstrated that it engaged in reasonable measures to protect the secrecy of its alleged trade secrets, are without merit. Cisco's tenuous contentions with respect to this issue are not sufficient to sustain its burden on summary judgment. Even if they were, Alcatel has responded with a sufficient proffer of evidence that its policies with respect to trade secret protections were reasonable.